

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the order of the Court.**

**Signed May 4, 2006**

*Barbara J. Houser*

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| RONALD D. WELLS, | § | CASE NO. 05-34432-BJH-7 |
| | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| RONALD HUGHES, SR. and | § | |
| RHONDA HUGHES, | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| -against- | § | CASE NO. 05-3629-BJH |
| | § | |
| RONALD D. WELLS, | § | |
| | § | |
| Defendant. | § | |

### <u>MEMORANDUM OPINION AND ORDER</u>

Before this Court is Plaintiffs Ronald and Rhonda Hughes' ("Hughes") Complaint Objecting

to Discharge (the "Complaint") of Defendant Ronald Wells ("Debtor" or "Wells"). A trial was held

on the Complaint commencing on April 10, 2006, and concluding on April 13, 2006 (the "Trial").

At the conclusion of the Trial, the Court took the Complaint under advisement. This Court has core

jurisdiction over the Complaint pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (J).

Based on the evidence introduced at Trial, and for the reasons enumerated below, the Court

finds that the Hughes have shown, by a preponderance of the evidence, that this Court should deny

Wells a discharge in his Chapter 7 bankruptcy case. This Memorandum Opinion and Order contains

the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy

Procedure 7052.

## I.    Procedural Background

Wells filed for relief under Chapter 7 on April 20, 2005 (the "Petition Date"), thereby

commencing this case (the "Case").[1] Main Case ("MC") docket ("dkt.") # 1.[2] Wells' prior attorney

of record, Joseph McNeff ("McNeff"),[3] hoped to file the Case prior to the enactment of, or

effectiveness of, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("BAPCPA").[4] Wells filed his initial set of Schedules and his Statement of Financial Affairs

("SOFAs") on May 16, 2005. MC dkt. # 8. Among the unsecured claims listed on Schedule F, Wells

---

[1]This is not Wells' first encounter with Chapter 7; Wells and his wife, Deborah, filed a prior Chapter 7 case in 1990, case number 90-31597-RCM-7. Pl. Exh. 104.

[2]The Court will take judicial notice of its dockets in the main case and the adversary proceeding. *Sec. & Exch. Comm'n v. First Fin. Group of Tex.*, 645 F.2d 429, 433 n.6 (5th Cir. 1981) (noting that "a court may take judicial notice of its own records").

[3]McNeff died shortly after the commencement of the Case. Gerrit Pronske substituted as counsel of record for Wells and represented Wells at Trial.

[4]The Case was not filed prior to the enactment of BAPCPA; BAPCPA was enacted on April 20, 2005, the same day as the Petition Date. For purposes of this Memorandum Opinion and Order, though, the date and time of enactment of BAPCPA are irrelevant.

listed a "Suit for Attorney's Fees"[5] in the amount of $453,000 claimed by the Hughes.[6] Pl. Exh. 4 at Sched. F. While the Hughes' claim was listed by Wells as unliquidated and disputed, *id.*, the Court liquidated the Hughes' claim in a prior adversary proceeding in which the Hughes sought a determination that their debt was excepted from Wells' discharge under § 523 of the Bankruptcy Code. In liquidating the Hughes' claim, the Court determined that the Hughes were entitled to a refund of attorney's fees from Wells in the amount of $165,000. *Hughes v. Wells (In re Wells)*, Ch. 7 Case No. 05-34432-BJH-7, Adv. No. 05-3594, Memorandum Op. & Order at 26-27 (Bankr. N.D. Tex. Mar. 8, 2006) (the "Prior Memorandum Opinion and Order").

On August 28, 2005, the Hughes filed the Complaint and objected to Wells' discharge pursuant to §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), 727(a)(4)(A), 727(a)(4)(D), 727(a)(5), and 727(a)(6)(A). Adversary Proceeding ("AP") dkt. # 1. The Schedules and SOFAs, and the information included or omitted therein, are at the heart of this dispute. Because of the voluminous evidence presented at Trial, the pertinent findings of fact will be included in the Legal Analysis section of this Memorandum Opinion and Order.

## II. Legal Analysis

### A. Section 727(a) Generally

Section 727(a) of the Bankruptcy Code mandates that a court grant a debtor a discharge unless one of the enumerated grounds for denying a discharge applies. 11 U.S.C. § 727(a) (2000). To that end, "[§] 727(a) must be construed liberally in favor of the debtor and strictly against [a]

---

[5]The "Suit for Attorney Fees" related to a complaint for a refund of attorney fees paid to Wells for representation that Wells provided to Rhonda Hughes' father, Ronald Hughes, Sr., in a federal district court criminal case.

[6]Under the "Creditor's Name," the creditors are listed as "Ronald Hughes & Rhonda Montee." Rhonda Montee is the married name of Rhonda Hughes.

creditor objecting to the granting of the debtor's discharge." *Cadle Co. v. Guenther (In re Guenther)*, 333 B.R. 759, 763 (Bankr. N.D. Tex. 2005) (Hale, J.); *see also Friendly Fin. Discount Corp. v. Jones (In re Jones)*, 490 F.2d 452, 456 (5th Cir. 1974). The burden of proof is on the objecting creditor to show, by a preponderance of the evidence, that the debtor's case falls within one of the enumerated exceptions of § 727(a), thereby permitting the Court to deny the debtor a discharge. *See Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992) (citing *Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 660, 112 L. Ed. 2d 755 (1991)); *see also Guenther*, 333 B.R. at 763-64.

### B. Transfer of Assets: § 727(a)(2)

The Hughes object to Wells being granted a discharge on the grounds that Wells made certain transfers of his property within one year prior to the Petition Date with the intent to hinder, delay, or defraud his creditors; the Hughes also allege that Wells made transfers of property of the estate after the Petition Date with improper intent. Section 727(a)(2) permits the denial of a debtor's discharge if

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A-B).

In order to prevail on their § 727(a)(2)(A) claim, the Hughes must prove, by a preponderance of the evidence, that (1) a transfer or concealment of property (2) belonging to Wells (3) was made

within one year of the Petition Date (4) with the intent to hinder, delay, or defraud a creditor of Wells. *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 565 (5th Cir. 2005); *Guenther*, 333 B.R. at 764. Likewise, in order to prevail on their § 727(a)(2)(B) claim, the Hughes must prove, by a preponderance of the evidence, that there was (1) a transfer, removal, or concealment of property (2) belonging to the estate (3) post-petition (4) that was made with the intent to hinder, delay, or defraud a creditor of Wells. *See Cadle Co. v. Pratt*, 2004 WL 718977, at *2 n. 2 (N.D. Tex. Mar. 31, 2004) (Lindsay, J.) *aff'd sub nom. Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561 (5th Cir. 2005); *see also Oldendorf v. Buckman*, 173 B.R. 99, 106 (E.D. La. 1994).

Evidence of a debtor's actual intent to defraud creditors is required to deny a debtor his discharge; constructive intent is not enough. *Pavy v. Chastant (In re Chastant)*, 873 F.2d 89, 91 (5th Cir. 1989). However, the intent to hinder, delay, or defraud may be inferred by a debtor's actions and proven by circumstantial evidence. *Id.*; *Guenther*, 333 B.R. at 764. Circumstantial factors that tend to prove an intent to hinder, delay, or defraud include:

"(1) the lack or inadequacy of consideration;
(2) the family, friendship, or close associate relationship between the parties;
(3) the retention of possession, benefit, or use of the property in question;
(4) the financial condition of the party sought to be charged both before and after the transaction in question;
(5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and
(6) the general chronology of the events and transactions under inquiry."

*Robertson v. Dennis (In re Dennis)*, 330 F.3d 696, 702 (5th Cir. 2003) (quoting *Chastant*, 873 F.2d at 91). Any of these factors alone may be sufficient to find an intent to hinder, delay, or defraud creditors; "the accumulation of several factors indicates strongly that the debtor possessed the requisite intent." *FDIC v. Sullivan (In re Sullivan)*, 204 B.R. 919, 941 (Bankr. N.D. Tex. 1997)

(Abramson, J.); *see also U. S. Trustee v. Baum (In re Baum)*, 2005 Bankr. LEXIS 514, at \*18

(Bankr. N.D. Tex. Mar. 30, 2005) (Jones, J.).

While numerous transfers were discussed at Trial,[7] the Court is particularly concerned with

two transfers: (1) the pre-petition transfer of certain funds earned by Wells in his law practice to his

minor son through the purchase of a cashier's check in his son's name, which cashier's check was

later used as earnest money for the purchase of Wells' current homestead, the Grassmere Property,[8]

---

[7]The entire list of suspect transfers enumerated in the Complaint includes: (1) the transfer of Unit 16 Sportsman's World to Yvonne Morrow on May 19, 2004; (2) a $25,000 earnest money transfer to Capital Title made from Wells' law practice operating account for the purchase of his new home at 4057 Grassmere in Dallas, Texas (the "Grassmere Property"); (3) the transfer of approximately $185,000 to various creditors of Wells in the ninety days prior to the Petition Date; (4) the transfer of a mineral interest in 400 acres of land in Palo Pinto County, Texas to the 1999 Crow Family Limited Partnership; (5) the granting of a $140,000 second lien on the Grassmere Property to Texas Community Bank; (6) the transfer of $63,500 in retirement funds from Wells' retirement accounts to David Bellow to purchase the Grassmere Property; (7) the transfer of a $39,000 real estate commission to David Bellow for the purchase of the Grassmere Property; and (8) the transfer of $16,000 from Wells' law practice operating account to Capital Title to be used for the purchase of the Grassmere Property. *See* AP dkt. # 1 at 4. At Trial, the Hughes also presented evidence regarding the transfer of estate funds for the completion of a pool at the Grassmere Property. It is not necessary to address all of these transfers given the Court's findings in connection with the two transfers addressed in the text.

[8]While the Hughes complain about the purchase of the Grassmere Property generally, the Court is less troubled with the purchase of the Grassmere Property in this context than it is with the two transfers identified in the text. However, the purchase of the Grassmere Property is the subject of objections to Wells' claims of exemptions in the Case by the Chapter 7 trustee and the Hughes. These objections have not yet been heard. Accordingly, the Court's observations here are without prejudice to its subsequent analysis of the purchase in the context of the objections to exemptions.

As relevant here, the Wells sold their prior homestead located at 4064 Hanover, Dallas, Texas (the "Hanover Property") on March 3, 2005, Pl. Exh. 8 at SOFA # 10, and purchased the Grassmere Property, a more expensive home, Pl. Exh. 16, a few days later. To purchase the Grassmere Property, the Wells borrowed $845,000 from World Savings Bank and granted a first lien on the Grassmere Property to secure repayment of this debt. Pl. Exh. 20-21; *see also* Pl. Exh. 4 at Sched. D. The balance of the $1.3 million purchase price was obtained from (i) the Wells' exempt equity in the Hanover Property, (ii) monies taken out of Wells' retirement accounts (also exempt property), (iii) a $39,000 commission credited to Wells from the purchase transaction—*i.e*, Wells represented himself in the transaction and was entitled to a commission as the purchaser's agent, and (iv) $41,000 of non-exempt cash from Wells' law practice. While the conversion of non-exempt cash into exempt homestead shortly before the bankruptcy filing is troubling, the evidence of intent to hinder, delay, or defraud creditors through the purchase of the Grassmere Property is less compelling. It appears that (i) the purchase of the Grassmere Property was largely Deborah Wells' idea, (ii) the Wells had been looking for a new home for some time, and (iii) the Wells had made numerous offers on other potential homes prior to the purchase of the Grassmere Property. As incredible as it sounds, Deborah Wells testified that she was unaware of her husband's contemplated Chapter 7 filing, and that she did not learn that he had actually filed for bankruptcy protection until shortly before the trustee came out to inspect the Grassmere Property and its contents. Wells corroborated her testimony in this regard. So, while the purchase of an expensive home on the eve of the bankruptcy filing looks horrible, it appears that at least one of the

---

**Memorandum Opinion and Order**

and (2) the post-petition transfer of property of the estate—*i.e.*, certain cashier's checks held by Wells on the Petition Date—for the completion of a pool at the Grassmere Property. Each transfer will be discussed in more detail.

### 1. The Earnest Money Transfer

Some background information is required. In his initial Schedules, Wells listed a claim by Regions Bank in the amount of $889,533 (the "Regions Claim") on Schedule F. Pl. Exh. 4 at Sched. F. According to Wells' testimony at Trial, the Regions Claim represents a judgment obtained by Regions Bank against Wells in connection with the failure of an 18-unit condominium development at Possum Kingdom Lake, Texas. The Regions Claim was not listed on Schedule F as either disputed, contingent, or unliquidated. *Id*. In short, Wells admits that he owes the debt.[9]

On January 14, 2005, Wells purchased a cashier's check from Fort Worth National Bank, check no. 9862 in the amount of $25,000, which check was used as earnest money for the purchase of the Grassmere Property (the "Grassmere Cashier's Check"). Pl. Exh. 84. While the Grassmere Cashier's Check was purchased by Wells, it was placed in the name of his fourteen-year old son, Austin, and was made payable to Capital Title. *Id*. According to Wells' Trial testimony, he purchased the Grassmere Cashier's Check with income generated from his law practice.[10] Interestingly, however, it appears that the Grassmere Cashier's Check was not purchased with a

---

spouses was unaware of this timing dilemma.

[9]In fact, the Regions Claim was the precipitating factor for the filing of the Case, according to Wells' Trial testimony.

[10]Wells could not conclusively identify the source of the funds used to purchase the cashier's check—*i.e.*, whether the funds were withdrawn from the law firm operating account or whether the funds came directly from a client check paid to Wells for legal services rendered. Rhonda Hughes testified, however, that she could find no evidence of a withdrawal from the law firm operating account because Wells never produced his office income records.

check drawn on Wells' law firm account. Rather, it appears that Wells took a client check(s) to the bank and converted that client check(s) into the Grassmere Cashier's Check.[11] When asked if he was concerned that the funds used as earnest money might have been able to be attached by Regions Bank in satisfaction of its judgment if left in his name, Wells admitted that he had made inquiry as to whether the funds used for earnest money might be subject to Regions Bank's judgment while at Capital Title. Moreover, Wells testified that he put the Grassmere Cashier's Check in Austin's name because he "couldn't get a direct answer from anyone about [his] status with Regions Bank." And, while Wells has amended his Schedules and SOFAs numerous times since the Petition Date, he has never disclosed this $25,000 transfer to Austin, or the purchase of the Grassmere Cashier's Check, in any version of his Schedules and SOFAs.[12]

After considering all of the evidence, the Court concludes that Wells put the Grassmere Cashier's Check in Austin's name to make sure that the money could not be reached by Regions Bank. The Court further concludes that the purchase of the Grassmere Cashier's Check constitutes a transfer of Wells' property within one year of the Petition Date with the intent to hinder, delay, or defraud a creditor—namely, Regions Bank.[13]

---

[11]Wells was unable to identify the client(s) whose funds were used. This practice of converting client checks into cashier's checks is troubling for another reason. As discussed in more detail later, Wells failed to keep adequate financial records. When law firm monies are not deposited into the law firm operating account, it is hard to later account for the funds. *See* II.C., *infra*.

[12]Wells did disclose his subsequent payment of $16,000.00 to Capital Title on March 1, 2005. Pl. Exh. 8 at SOFA # 3.

[13]At Trial, Wells' counsel cited *Guenther* for the proposition that a transfer of a debtor's property that never leaves the debtor's control is not improper. The transactions in *Guenther* were between entities controlled by the debtor, and the evidence did not establish that any of the transfers were made with improper intent—*i.e.*, to hinder, delay, or defraud creditors. 333 B.R. at 764. Here, the facts are quite different. While Wells retained control of the $25,000 after it was transferred into his fourteen-year old son's name, it cannot be disputed that the transfer was made to frustrate any attempt by Regions Bank to collect on its judgment against Wells.

The Court finds fraudulent intent here by comparing the circumstantial factors identified previously with our facts. First, Wells all but admitted that he transferred the funds to his son with the intent to hinder Regions Bank's collection efforts. Moreover, this transfer to Austin was made for no consideration.[14] Wells benefitted from putting the funds in Austin's name—*i.e.*, by preventing the attachment of them by Regions Bank, and he retained the use of the funds—*i.e.*, by applying them toward the purchase of the Grassmere Property. The fact that Wells was in significant financial difficulty when the transfer to Austin was made is beyond dispute. Taken together, these facts demonstrate Wells' intent to hinder Regions Bank's collection efforts in connection with this pre-petition transfer of his property.

Accordingly, Wells' discharge must be denied in accordance with § 727(a)(2)(A).

### 2. The Pool Transfers

On March 29, 2005, just 22 days before the Petition Date, Wells signed a contract with Master Craft Pools for the construction of a swimming pool on his new homestead—*i.e.*, at the Grassmere Property. Pl. Exh. 55. The contract price for the pool was $59,000. *Id*. Needless to say, it is a very nice pool, complete with slide, fire pit, waterfall, etc. *Id*. The contract specified that payments were to be made at certain intervals throughout the pool's construction: "20% day of excav[ation]; 40% day of gunite; 20% after tile, coping and elec.; 15% after decks poured; 5% prior to plaster." *Id*. To pay for the pool's construction, Wells purchased five cashier's checks from Fort Worth National Bank made payable to Master Craft Pools: check no. 12122 on March 29, 2005, for $11,800.00; check no. 12123 on March 29, 2005, for $11,800.00; check no. 12124 on March 30,

---

[14] "'[A] presumption of actual fraudulent intent necessary to bar a discharge arises when property is either transferred gratuitously or is transferred to relatives.'" *Chastant*, 873 F.2d at 91 (quoting *In re Butler*, 38 B.R. 884, 888 (Bankr. D. Kan. 1984)).

2005, for $5,900.00; check no. 12125 on March 30, 2005, for $23,600.00; and check no. 12186 on April 14, 2005, for $5,000.00.[15] Pl. Exh. 56-58.

At Trial, Wells testified that he made the bulk of the payments for the pool when the construction project was started, and that he had fully paid for the pool by the Petition Date. Wells' SOFAs reflect payments to Master Craft Pools on March 30, 2005, and April 14, 2005. Pl. Exh. 8 at SOFA # 3. However, for the reasons explained below, the Court does not believe Wells' Trial testimony or the information contained in the SOFAs.

John Rador, co-owner of Master Craft Pools and the person who actually installed the Wells' pool and was paid for the installation, was subpoenaed to testify at Trial by the Hughes. Rador testified that Wells did not pay him the entire contract price for the pool at the commencement of construction or shortly thereafter. Rather, Rador testified that he was paid in accordance with the payment schedule set forth in the contract—*i.e.*, at either the beginning or the end of the intervals identified in the contract. Rador also testified that he thought it took him about two months to complete the Wells' pool. In fact, he specifically remembered certain weather delays encountered on the Wells' job. When asked whether there was any way he was paid in full for construction of the pool by April 20, 2005 (the Petition Date), Rador testified no.[16] Rador testified that he may have

[15]These checks total $58,100, $900 less than the contract price. Pl. Exh. 55. In fact, Master Craft Pools was never paid this $900 by Wells, and Master Craft Pools was not scheduled as a creditor on Schedule F or listed on the creditor matrix. Master Craft Pools learned of Wells' bankruptcy filing when served with discovery requests by the Hughes.

[16]There was some uncertainty by Rador as to the dates the pool was started and ultimately completed, leading to a line of hypothetical questioning by both Wells' and the Hughes' counsel as to possible dates of completion of the pool. The Court also posed some questions to Rador and was told that the fastest a pool of this size could be completed was three to four weeks, and that the fastest Rador had ever pulled construction permits from the City of University Park, where the Grassmere Property is located, was one and one-half days. Based on these absolute minimum times as testified to by Rador, the Court finds that, as a matter of fact, there is no way that the Wells' pool could have been completed pre-petition. The contract was signed on March 29, 2005. Even assuming that the permits were pulled the next day, and the pool was started the morning of April 1st, the earliest

received the first two payments—*i.e.*, for excavation and gunite—as of the Petition Date, but probably no more than that. What this means, of course, is that Master Craft Pools received three payments (by cashier's checks purchased prior to the Petition Date) from Wells after the Petition Date.

After considering all of the evidence, the Court finds that the credible evidence compels the conclusion that Wells concealed, and then transferred, property of the estate—*i.e.*, the cashier's checks still on hand on the Petition Date (which were not disclosed on Schedule B)—after the Petition Date, with the intent to hinder, delay, or defraud his creditors and/or the Chapter 7 trustee, Scott Seidel (the "Trustee"). Specifically, Wells concealed, and then transferred, property—*i.e.*, the funds used to pay for completion of the pool. These funds clearly belonged to the estate as of the Petition Date, as the cashier's checks represented cash on hand that should have been included on Wells' Schedule B and turned over to the Trustee. Moreover, at least some of the payments to Master Craft Pools were made post-petition. Finally, the payments were made with an intent to hinder, delay, or defraud Wells' creditors and/or the Trustee.

Regarding intent to hinder, delay, or defraud, the Court once again compares the facts of this case to the circumstantial factors identified previously. First, Wells purchased cashier's checks to pay for the pool's construction to prevent Regions Bank from attaching those funds while in Wells' bank accounts. Moreover, the Court concludes that Wells purchased cashier's checks to pay for the pool's construction because he knew that the pool could not be completed prior to the Petition Date, and

---

possible completion date would be April 22, 2005, two days after the Petition Date. Moreover, this absolute minimum time fails to account for the fact that (i) Master Craft Pools was not in a position to start the Wells' pool immediately, (ii) Rador specifically remembered weather delays on the Wells' job, and (iii) Rador's initial answer to the question of how long it took him to complete the Wells' pool was a couple of months.

**Memorandum Opinion and Order**                                                    **Page 11**

he wanted to use pre-petition non-exempt funds to complete the pool's construction (on his new homestead property), instead of using post-petition earnings which are not available to pre-petition creditors because such earnings are not property of the estate under § 541(a)(6) of the Bankruptcy Code. By using funds that would otherwise be subject to his pre-petition creditors' claims, Wells received a double benefit—*i.e.*, he took non-exempt assets and attempted to convert them into exempt assets by increasing the value of his exempt homestead through the completion of a lovely pool—while conserving his post-petition earnings and having them available to pay for other post-petition purchases. Instead of turning the remaining cashier's checks over to the Trustee upon the commencement of the Case and completing construction of, and the payment for, the pool out of his post-petition earnings, the remaining cashier's checks were kept in a drawer near the front door of the Grassmere Property (according to Deborah Wells' testimony) and paid to Rador as each construction phase identified in the pool contract was reached or concluded, as applicable.

Second, Wells' efforts to disguise the true date of his payments to Master Craft Pools by using cashier's checks evidences an intent to hide these transfers from creditor or Court scrutiny.[17] Moreover, Wells did not disclose his contract with Master Craft Pools on Schedule G—his executory contract schedule. While Wells' counsel argued that the pool contract was no longer executory on the Petition Date because Wells had completed his performance prior to the Petition Date (by pre-paying the contract), the Court rejects this contention. Wells did not pre-pay the pool contract. The pool contract remained executory on the Petition Date, and it should have been disclosed to creditors

---

[17]Question number 3 on Wells' SOFAs requires that he list the date payments were made to creditors within the ninety days prior to the Petition Date. Wells listed four payments as being made to Master Craft Pools on March 30, 2005, and one additional payment was listed as being made on April 14, 2005. Pl. Exh. 8 at SOFA # 3. Rador's testimony at Trial makes it clear that these dates are inaccurate. Four checks were not given to Rador on March 30, 2005. Construction had not even begun on that date, as the contract was only signed the day before.

on Schedule G.  In fact, the contract was never disclosed by Wells at all.  Rather, it was discovered

by the Hughes during their Trial preparation.

For these reasons, the Court concludes that Wells had the requisite intent to hinder, delay, or

defraud his creditors and/or the Trustee in connection with the post-petition pool transfers.

Accordingly, Wells' discharge must be denied in accordance with § 727(a)(2)(B).

### C.     Failure to Preserve Financial Information:  § 727(a)(3)

The Hughes also seek a denial of Wells' discharge on the grounds that he failed to keep or

preserve financial information from which his financial condition or business transactions could be

ascertained.  Under § 727(a)(3), the Court can deny a debtor a discharge where

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve
> any recorded information, including books, documents, records, and papers, from
> which the debtor's financial condition or business transactions might be ascertained,
> unless such act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).

The initial burden is on the Hughes to prove that Wells failed to keep or preserve his financial

records, and that such failure kept the Hughes from ascertaining Wells' financial condition or business

transactions.  *Dennis*, 330 F.3d at 703; *Guenther*, 333 B.R. at 765.  Once the Hughes have met their

burden of proving that Wells failed to keep or preserve sufficient information from which his financial

condition or business transactions could be ascertained, the burden then shifts to Wells to prove that

the inadequacy of his records is justified by the totality of the circumstances, including proving what

records a reasonable person in similar circumstances would have kept.  *Guenther*, 333 B.R. at 765;

*see also Dennis*, 330 F.3d at 703.  The Court has wide discretion in determining whether Wells'

financial records provide sufficient detail and, if not, whether the totality of the circumstances justifies

the inadequacy of his financial records.  *See Dennis*, 330 F.3d at 703; *see also Goff v. Russell Co.*

*(In re Goff)*, 495 F.2d 199, 202 (5th Cir. 1974).

Courts understand that debtors often keep poor financial records, and an "impeccable system of bookkeeping" is not required; however, "creditors should not be required to speculate about the financial condition of the debtor or hunt for the debtor's financial information." *Guenther*, 333 B.R. at 765. The purpose of imposing the duty on a debtor to preserve financial records is to allow creditors to determine what property has passed through the debtor's hands. *Id*. While the debtor's financial records "need not contain 'full detail,' . . . 'there should be written evidence' of the debtor's financial condition." *Dennis*, 330 F.3d at 703 (quoting *Goff*, 495 F.2d at 201); *Guenther*, 333 B.R. at 765. A debtor has a duty to take "reasonable precautions" in preserving his financial records. *Guenther*, 333 B.R. at 765. The financial records a debtor maintains should be appropriate and reasonable for a debtor of similar sophistication. *See Dennis*, 330 F.3d at 703; *see also Goff*, 495 F.2d at 201-02 (noting that different standards for bookkeeping should be applied to unsophisticated wage earners and those individuals who are merchants); *J.P. Morgan Chase Bank v. Hobbs (In re Hobbs)*, 333 B.R. 751, 758 (Bankr. N.D. Tex. 2005) (Hale, J.) (noting that, when addressing justification argument of debtor for failure to keep adequate records, inquiry should include consideration of the debtor's education, experience, and sophistication).

In a personal bankruptcy case, the "quintessential documents" that must be preserved and kept are the debtor's income tax returns. *Dennis*, 330 F.3d at 703 (upholding bankruptcy court's decision not to deny the debtor, an unsophisticated wage earner, a discharge under § 727(a)(3) because the debtor had provided numerous tax returns and bank, payroll, and other records); *see also Chemoil, Inc. v. Pfeifle (In re Pfeifle)*, 154 Fed. Appx. 432, 434-35 (5th Cir. 2005) (upholding, in unpublished opinion, bankruptcy court's decision not to deny debtor a discharge under § 727(a)(3), where the

debtor, a sophisticated wage earner, produced four years of income tax returns and other documentation to creditors);[18] *cf. Womble v. Pher Partners (In re Womble)*, 108 Fed. Appx. 993, 995-96 (5th Cir. 2004) (finding, in unpublished opinion, that sophisticated, college-educated debtor who ran several businesses for a number of years, who had been in bankruptcy several times, and who employed able attorneys, was rightfully denied a discharge under § 727(a)(3)).[19]   However, the mere fact that a debtor has produced his tax returns may not be enough to prevent the denial of a discharge if the debtor's creditors cannot ascertain his financial condition or business transactions without the production of other documentation.  *See Cadle Co. v. Terrell (In re Terrell)*, 46 Fed. Appx. 731, 731 (5th Cir. 2002) (upholding, in unpublished opinion issued per curiam, bankruptcy court's denial of debtor's discharge under § 727(a)(3)).[20]   For instance, the debtor's failure to provide bank and credit card statements can also form the basis for denying a discharge under § 727(a)(3), for such documents "'form the core of what is necessary to ascertain the debtor's financial condition, primarily his use of cash assets.'"  *Hobbs*, 333 B.R. at 757 (quoting *Ochs v. Nemes (In re Nemes)*, 323 B.R.

---

[18]Under the Fifth Circuit's rules concerning unpublished opinions issued on or after January 1, 1996, unpublished opinions are generally not precedent; they "may, however, be persuasive."  5th Cir. R. 47.5.4.

[19]In *Womble*, the debtor did not justify his failure to (i) maintain written records of loans and leases between debtor-owned entities; (ii) introduce lease agreements or invoices to substantiate transfers between debtor-owned entities; (iii) file tax returns for debtor-owned entities for five years; and (iv) make records explaining why the debtor took money from debtor-owned entities.  108 Fed. Appx. at 995-96.

[20]In *Terrell*, the debtor scheduled $59,000 in credit card debt but failed to provide any documentation substantiating this debt.  46 Fed. Appx. at 731.  The court determined that, even though the debtor had provided copies of tax returns, bankruptcy schedules, copies of automobile insurance records, and the debtor's last will and testament, the failure to provide (i) credit card records, which the debtor could have obtained from his credit card company, and (ii) bank statements on the debtor's wife's bank account were sufficient to conclude that the debtor had failed to meet his duty of full disclosure entitling him to a discharge.  *Id.*  While the Fifth Circuit has seemingly moved away from the need for a debtor to provide absolute full disclosure of all documentation that the debtor might be able to access, *compare Pfeifle*, 154 Fed. Appx. at 435 (noting that, because creditor's ability to ascertain debtors' financial condition unimpeded by debtors' failure to provide full detail of all their financial records, bankruptcy court's refusal to deny debtors' discharge not clear error) *with Terrell*, 46 Fed. Appx. at 731 (noting that complete financial disclosure a condition precedent to privilege of discharge), the fundamental directive of the Bankruptcy Code still exists–*i.e.*, the debtor must provide at least sufficient information from which his financial condition and business transactions can be ascertained.  *See Dennis*, 330 F.3d at 703.

**Memorandum Opinion and Order**                                                                 **Page 15**

316, 324 (Bankr. E.D.N.Y. 2005)).

As with the analysis of the transfers of Wells' assets, the Hughes point to a number of instances of Wells failing to keep or preserve adequate financial records from which his financial condition or business transactions can be determined.[21] While the Hughes complained of Wells' failure to produce *signed* tax returns to them or the Trustee, it was ultimately revealed that the Hughes had obtained the last five years of Wells' tax returns from Wells' accountant, mooting this complaint.[22] Moreover, Wells testified that he did not keep signed copies of his tax returns. The Court is satisfied that Wells, like many taxpayers, signs the original return he files with the IRS, but never signs the duplicate copy that he retains. There does not appear to be any reason to believe that the unsigned copies produced by Wells' accountant are not true and correct copies of the tax returns as filed with the IRS. And, while the tax returns are the "quintessential documents" for ascertaining a debtor's financial condition, the mere production of those documents does not satisfy Wells' obligation under the Bankruptcy Code to keep other financial records from which his financial condition or business transactions can be ascertained.

Given the extent of Wells' pre-petition financial transactions and his relative income level and level of financial sophistication, Wells kept very few financial records. For instance, when asked specifically whether he throws away his bank statements, Wells indicated that he does:

Counsel:    Do you throw away your bank statements?

Wells:      I throw away a lot of the bank statements, yes ma'am.

---

[21]In fact, the list is voluminous, to say the least; the Hughes fill nearly 14 pages of the Complaint with documents requested from Wells but not produced in connection with his Rule 2004 examination. AP dkt. # 1 at 9-22. The Court will address in this Memorandum Opinion and Order those failures to produce which it finds most troublesome.

[22]In fact, the Plaintiffs' Witness and Exhibit List indicates that they possess tax returns for Wells going back to 1998. AP dkt. # 11.

No credible explanation was offered by Wells for his failure to keep these, and other, financial records, including his credit card statements.

Wells' failure to keep adequate financial records is surprising for at least two reasons. First, Wells is a well-educated and sophisticated person, having been involved in significant real estate transactions and having run his own law practice for over twenty years. Second, Wells has been through bankruptcy before, and he is, or should be, aware of the responsibilities that come with being a Chapter 7 debtor. Accordingly, Wells should be held to a higher standard in maintaining his financial records than that of an ordinary wage earner. And, while Deborah Wells is not a debtor in the Case, she too is a licensed attorney. While she no longer practices law, she did for a number of years and, most recently, was a senior vice president with Bank of America. However, instead of maintaining financial records or a bookkeeping system correlative to their educational backgrounds, income level, and relative financial sophistication, the Wells do just the opposite—they keep virtually no records for any period of time.

It appears that Wells is responsible for much of the financial affairs of the Wells' family. The only financial responsibilities for the family undertaken by Deborah Wells appear to be with respect to (i) what Deborah Wells views as her separate property—*i.e.*, her retirement accounts from her prior employment and her interest in what is called B.W. Farms—farm land she inherited from her father a number of years ago[23]—and (ii) the children's UGMA[24] accounts (for which she is the designated agent). Otherwise, it appears that Wells is responsible for the family's financial affairs and business transactions. Unfortunately, Wells does not maintain any real financial records of the

---

[23]An issue exists as to whether Deborah Wells' interest in B.W. Farms is her separate property. That issue will be further developed, no doubt, in the context of the objections to exemptions.

[24]UGMA stands for the Uniform Gifts to Minors Act.

family's expenses or his other financial affairs, other than for very short periods of time. And, Wells' memory of his (or the family's) financial affairs and business transactions, without documents to refresh his recollection, was not terribly helpful.[25]

Further, Wells was less than forthcoming in facilitating the production of financial records for the Hughes' review. Wells took a narrow view of his obligation to produce documents. If he no longer had copies of the requested documents, Wells took the position that he had nothing to produce and that he needed to do nothing further. So, instead of requesting duplicate copies of his financial records from third parties who would obviously still have copies, Wells proudly recounts his consent to thirteen motions for Rule 2004 examinations of such third parties (together with document requests) filed by the Hughes. Further, Wells emphasized repeatedly at Trial that he had offered to sign a release for any documents or information he no longer had copies of (because he had disposed of those records), so that the Hughes could go get the documents or information for themselves.

Of course, what Wells overlooks is the fact that the Hughes would not have been required to take the thirteen additional 2004 exams, nor would it have been necessary to offer to sign document releases, if Wells had simply kept adequate records of his financial affairs and business transactions, as a reasonably prudent person of Wells' income level and financial sophistication normally would. Wells' lack of documentation was shocking, given his education, income level, and business experience.

While it is unnecessary to address each alleged incident of Wells' failure to preserve

---

[25]Interestingly, one of Wells' rebuttal witnesses, Darlene Poston of Reliance Mortgage, testified to Wells' meticulous nature and attentiveness to detail when filling out loan paperwork with Reliance Mortgage. Ms. Poston's impressions of Wells' attentiveness to detail was surprising, and hard to reconcile with the lack of financial documents that Wells was able to produce for either the Trustee or the Hughes, unless one concludes that the lack of documents was a deliberate choice.

**Memorandum Opinion and Order** **Page 18**

documents, the Court will address several of the more troublesome ones.[26] Among the documents that the Hughes requested that have not been provided are credit card statements of Wells' American Express accounts.[27] Wells disclosed payments totaling $30,046.70 to American Express in the ninety days prior to the Petition Date. Pl. Exh. 8 at SOFA # 3. According to Rhonda Hughes' Trial testimony, the Hughes have never received a single American Express statement detailing the charges paid by Wells in the ninety days prior to his bankruptcy filing. This can be attributed, in large part, to Wells' failure to save even his recent credit card statements.[28] At the very least, Wells could have requested duplicate copies of his statements from American Express. Presumably, Wells could have printed duplicate copies for himself electronically through internet access to his accounts. However, he did neither.[29]

Additionally, Rhonda Hughes testified that she had never received a copy of the financial statement Wells identified in his SOFAs as having been provided to Regions Bank within the two

---

[26]The difficulty in addressing some of the allegedly withheld documents is that the Hughes failed to prove the existence of certain of the requested documents at any point in time. Obviously, Wells cannot be held responsible for failing to produce documents if the documents never existed.

[27]The American Express accounts include, according to Wells' SOFAs, an American Express account, an American Express Gold account, and an American Express Platinum account. Pl. Exh. 8 at SOFA # 3.

[28]It should be noted that

[n]ot every time will the failure to maintain credit card and bank records bar a discharge. Often these records will be maintained for a time and then legitimately discarded by a debtor. However, a [d]ebtor . . . has some responsibility to make some efforts to retain minimal records and to produce them to the Trustee and requesting creditors."

*Hobbs*, 333 B.R. at 758. Wells failed to maintain even his recent credit card statements; this practice of near instantaneous discard of important financial documents is not legitimate.

[29]These facts are similar to the facts in *Terrell*, where the debtor was denied a discharge under § 727(a)(3) because he failed to provide any documentation substantiating nearly $59,000 in credit card debt, even though he provided copies of his tax returns for his creditors' review. 46 Fed. Appx. at 731. Likewise, in *Hobbs*, the debtor was denied a discharge under § 727(a)(3) for her inability to justify her failure to produce either her personal credit card or bank statements, notwithstanding the fact that she had produced some tax returns. 333 B.R. at 758.

years prior to the Petition Date.[30] Pl. Exh. 4. at SOFA # 19(d). Once again, other than responding that he no longer had a copy of that financial statement, Wells did nothing to facilitate obtaining a copy of it from Regions Bank. Rather, on cross-examination of Rhonda Hughes, Wells' counsel asked whether the Hughes had sought a 2004 examination of Regions Bank, suggesting that it was the Hughes' burden to go get, and then piece together, Wells' financial history. These are just two examples where Wells has failed to keep and preserve fairly standard financial documents from which his financial condition and business transactions could be ascertained.

Discharge is a privilege, not a right, and it should only be provided "to those debtors who put forth a good faith effort in producing an entire picture of their financial affairs." *Hobbs* 333 B.R. at 755. After considering all of the evidence at Trial, the Court finds that Wells did not put forth a good faith effort to produce an entire picture of his financial affairs. Moreover, Wells cannot shift that responsibility to his creditors or the Trustee. The Trial testimony evidences a long and tortured journey on the Hughes' part to try to piece together Wells' financial affairs and business transactions. Through a litany of discovery weapons, perseverance, and financial expense, the Hughes have been able to piece together what can best be described as an opaque picture of Wells' financial condition and business transactions,[31] but to this day, no one, save Wells, is sure whether his creditors or the Trustee have a full understanding of his pre-petition financial condition and business transactions.

---

[30]Interestingly, while initially disclosed, by Wells' third amended set of Schedules and SOFAs, the financial statement issued to Regions Bank was no longer disclosed in answer to question 19(d). *Compare* Pl. Exh. 4 at SOFA # 19(d) *with* Pl. Exh. 8 at SOFA # 19(d).

[31]Of course, most creditors would not undertake these extraordinary efforts to understand a debtor's financial condition and business transactions. The obvious hard feelings that exist between Wells and the Hughes are explained in some detail in the Prior Memorandum Opinion and Order, and provide some insight into why the Hughes were willing to persevere. The point is, however, that creditors should not have to undertake this level of effort to understand a debtor's financial condition and business transactions. A debtor should be able to produce documents explaining his financial condition and business transactions, or be able to offer testimony detailing them in response to creditor or trustee inquiry. Here, Wells had neither, for all practical purposes.

**Memorandum Opinion and Order** **Page 20**

The Hughes have met their burden of showing that Wells' failure to keep and preserve adequate financial records impaired their ability to ascertain his financial condition and business transactions. Wells failed to justify his failure to keep and preserve adequate financial records. Accordingly, Wells' discharge must be denied in accordance with § 727(a)(3).

### D. False Oath: § 727(a)(4)

Next, the Hughes claim that Wells should be denied a discharge under § 727(a)(4)(A) because Wells made false oaths in his original Schedules and SOFAs. Section 727(a)(4)(A) states that a debtor's discharge may be denied where "the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." 11 U.S.C. § 727(a)(4)(A). In order to prevail on their § 727(a)(4)(A) claim, the Hughes must show that "'(1) [Wells] made a statement under oath; (2) the statement was false; (3) [Wells] knew the statement was false; (4) [Wells] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.'" *Pratt*, 411 F.3d at 566 (quoting *Beaubouef*, 966 F.2d at 179); *Guenther*, 333 B.R. at 766.

Moreover, a debtor who files Chapter 7 has a continuing, affirmative duty to disclose the following information completely and accurately: "'(a) a list of creditors; (b) schedules of assets, liabilities, current income, and current expenditures; and (c) a statement of financial affairs.'" *Guenther*, 333 B.R. at 766 (quoting *Gebhardt v. Gartner (In re Gartner)*, 326 B.R. 357, 367 (Bankr. S.D. Tex. 2005) (citing *Browning Mfg. v. Mims* (*In re Coastal Plains, Inc.)*, 179 F.3d 197, 208 (5th Cir. 1999)). Full disclosure of a debtor's assets and liabilities is required because the purpose of the schedules is to insure that adequate information is available for the debtor's creditors without the need for investigation to determine whether all the information provided in the schedules and SOFAs is true. *Pratt*, 411 F.3d at 566; *Guenther*, 333 B.R. at 766. "A debtor has a paramount duty to

carefully consider all questions posed on his schedules and statement of affairs and see that each question is answered completely in all respects." *Morton v. Dreyer (In re Dreyer)*, 127 B.R. 587, 593-94 (Bankr. N.D. Tex. 1991) (Akard, J.).

False oaths can be in the form of false statements or omissions on the schedules and statements of financial affairs or false statements made by the debtor during the course of the bankruptcy proceedings. *Guenther*, 333 B.R. at 766*; see also Pratt*, 411 F.3d at 566. While a debtor's schedules and statement of financial affairs need not be perfect, they are documents of substance and importance and are required to be signed under oath; debtors who display "reckless indifference" in filling out their schedules and statement of financial affairs are not entitled to a Chapter 7 discharge. *Guenther*, 333 B.R. at 767 (citing *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001) and *Beaubouef*, 966 F.2d at 178). "Debtors who make more than one false statement under oath with an opportunity to clear up the inconsistencies have demonstrated recklessness, which is sufficient for the bankruptcy court to infer the requisite intent." *Guenther*, 333 B.R. at 767 (citing *Beaubouef*, 966 F.2d at 178).

In *Guenther*, the court denied the debtors a discharge under § 727(a)(4)(A) based on the debtors' pattern of fraudulent behavior—namely, the debtors' "inability to be truthful or complete in their disclosures prior to and during the bankruptcy process." *Id.* at 768. The *Guenther* court noted that, when viewed in isolation, the incidents of and intent behind certain omissions from the debtors' schedules and statement of financial affairs may have been innocuous, but when looked at as an aggregate, a pattern of disregard for the truth began to appear. *Id.* at 767. The court was unimpressed with the debtors' obvious gamesmanship and hide-the-ball approach to completion of their schedules and statement of financial affairs:

> [T]he Debtors have thwarted the discovery and disclosure process in every encounter
> with [the creditor].  The obvious game playing strikes at the purpose of why a false
> oath can cause a discharge to be denied.  On every occasion, whether it was pre-
> petition discovery, the SOFA or the original Schedules, the Debtors withheld some
> information.

*Id.* at 767.  The court went on to note that, where confronted with mistaken information in the

schedules, "the appropriate response [of the debtors] is to offer amended information in a prompt

fashion, and not to wait to amend the errors only after the insistence of one of [the debtors']

creditors.  *Id.* at 767-68.  Ultimately, the court determined that the debtors' pattern of non-

responsiveness, coupled with an extended delay in amending the schedules to include the missing

information, was sufficient, under the totality of the circumstances, to find the debtors had acted with

fraudulent intent and/or reckless indifference to the truth and, accordingly, possessed the requisite

fraudulent intent to deny a discharge under § 727(a)(4)(A).  *Id.* at 768.

Notwithstanding a finding of fraudulent intent, it is also necessary that the omissions or

statements be materially related to the debtor's bankruptcy case.  *Id.*  The *Guenther* court noted that

"'[a] false oath is "material" and thus sufficient to bar discharge, if it bears a relationship to the

bankrupt's business transactions or estate, or the existence and disposition of his property.'" *Id.*

(quoting *Pratt*, 411 F.3d at 566).[32]  "'A debtor's claim that he omitted an asset because the asset has

no value or would not be detrimental to creditors is irrelevant and without merit.  Creditors are

entitled to judge for themselves what will benefit, and what will prejudice, them.'"  *Id.* (quoting

*Gartner*, 326 B.R. at 372).

As with the other grounds upon which the Hughes seek a denial of Wells' discharge, there

---

[32]The debtors in *Guenther* omitted certain bank accounts, interests in businesses, transfers of property, and the identity of their accountants.  333 B.R. at 766-67.  The court found the omissions material because they bore a relationship to the debtors' estate.  *Id.* at 768.

**Memorandum Opinion and Order**                                                                 **Page 23**

is a litany of alleged misrepresentations or omissions on Wells' original and amended Schedules and SOFAs, to which we now turn.  Wells first amended his Schedules and SOFAs on May 23, 2005, to include, *inter alia*, the following:  (1) $600 in additional guns; (2) a transfer of a Palo Pinto County mineral interest; (3) the closing of a Charles Schwab SEP account in the amount of $54,000 to purchase the Grassmere Property; (4) the closing of a Fidelity SEP account in the amount of $9,500; and (5) Wells' account at Texas Community Bank.  Pl. Exh. 5; MC dkt. # 11-12.

Wells amended his Schedules and SOFAs a second time on July 18, 2005, to include, *inter alia*, the following:  (1) Deborah Wells' checking account with Fort Worth National Bank; (2) the addition of Deborah Wells' artwork and collections without any assigned value; (3) the children's UGMA accounts in the amount of $232,900; (4) $2,500 in law firm accounts receivable; (5) a $25,000 membership at Royal Oaks Country Club; (6) the children's sporting equipment, listed with an unknown value; (7) decreases in Wells' reported gifts to charity; (8) the transfer/sale of the Hanover Property, Wells' prior homestead; and (9) a listing of the children's UGMA accounts as property held for another.  Pl. Exh. 6; MC dkt. # 30-31.[33]

Wells amended his Schedules and SOFAs a third time on August 23, 2005,[34] to include, *inter alia*, the following: (1) a reduction in the scheduled value of household goods from $19,900 to

---

[33]The Hughes' counsel did not introduce the July 18, 2005, amendment to Wells' SOFAs as an exhibit at Trial.  The Court will take judicial notice of the July 18th amendment to Wells' SOFAs as it was filed on the Court's docket.

[34]Wells third set of amended Schedules and SOFAs contain differing dates of amendment in the header of each document—*e.g.*, the SOFAs state that they were amended on August 18, 2005, Schedule C states that it was amended on August 16, 2005; however, none of the third set of amendments was filed with the Court until August 23, 2005.  MC dkt. # 57-59.  Likewise, the captioning of the various sets of amendments to the Schedules and SOFAs was not undertaken in a precise manner—*e.g.*, the second amendment to Wells' SOFAs was titled "Debtor's First Amendment to Statement of Financial Affairs of Ronald D. Wells."  *Compare* MC dkt. # 31 *with* MC dkt. # 11.

$17,750;[35] (2) a reduction in the scheduled value of artwork from $34,550 to $25,050; (3) a change in the value of the Royal Oaks Country Club membership to $0; (4) a change in Wells' reported gross income for years 2003 and 2004; (5) the addition of Leonard Wells' account as property held for another; and (6) the reduction of the scheduled value for one of the Yukon vehicles to $0.[36] Pl. Exh. 7-8; MC dkt. # 57-59.

Despite three sets of amendments, the Hughes allege that Wells' Schedules and SOFAs still omit the following information: (1) the refund due on Wells' 2003 tax return that is being held by the IRS; (2) a Bank of America account; (3) Wells' $39,000 commission from the purchase of the Grassmere Property;[37] (4) a second Fidelity Investment account; (5) the correct amount of the Schwab account as of March 22, 2005; (6) boats for which Wells provided certificates of titles; (7) Wells' monthly payments into his children's UGMA accounts; (8) Wells' monthly payments into his brother's account; (9) the pre-payment by Wells of a vacation cabin; (10) an antique armoire in Wells' possession; and (11) the correct balance of home equity line of credit loan advances that Wells received. AP dkt. # 1 at 24-25.[38]

---

[35]This change reflects a correction of a mathematical error in adding up the scheduled value of household goods.

[36]A significant number of the claimed omissions or mistakes involve issues dealing with changes to values of property included in Wells' Schedules and SOFAs and/or its classification as exempt/non-exempt property. The more significant of these "re-characterizations," as they were referred to by Wells at Trial, include Wells' purported ownership interest in B.W. Farms, property that Wells lists as his wife's separate property in his Schedules; Wells' purported ownership interest in the HART statue, also listed in his Schedules as his wife's separate property; and the listing on Wells' Schedules of a 2003 GMC Yukon as his wife's sole management community property, notwithstanding the fact that Wells is the record title holder on the certificate of title for the vehicle. Pl. Exh. 7. As noted previously, the Hughes have objected to Wells' exemptions, so these issues will be fully aired in that context. Accordingly, the Court will not address them here.

[37]The Court notes that the Complaint references the omission of a $39,000.00 commission made on the sale of the Hanover Property. AP dkt. # 1 at 24. However, based on the testimony received at Trial, it is clear that the $39,000.00 commission in question relates to Wells' purchase of the Grassmere Property.

[38]Several of these alleged omissions do appear on Wells' Schedules and SOFAs; for instance, Wells does disclose the monthly payments into his children's UGMA accounts, as well as the existence of Social Security and

At Trial, it also became clear that Wells had never disclosed on any set of Schedules or SOFAs (1) the executory contract with Master Craft Pools for the construction of the pool at the Grassmere Property, (2) the undelivered cashier's checks made payable to Master Craft Pools, and (3) the transfer of $25,000 into Austin Wells' name in connection with the Grassmere Cashier's Check and the purchase of the Grassmere Property discussed previously. *See* II.B., *supra*. Further, Wells failed to disclose a $600,000 refinance of the Hanover Property with World Savings in June 2004.[39] Pl. Exh. 9-11.

While all of these additions, deletions, re-characterizations, and omissions were discussed at Trial, the Court is particularly concerned about several significant, and continuing, omissions. First, Wells failed to disclose a $39,000 commission he earned upon the purchase of his new homestead—*i.e.*, the Grassmere Property, in disclosing his income in 2005 in response to SOFA question one. Second, and as noted previously, Wells failed to disclose the executory contract with Master Craft Pools for the construction of the pool at the Grassmere Property. Third, Wells failed to disclose the $25,000 transfer to his minor son, Austin, in connection with the Grassmere Cashier's Check and the purchase of the Grassmere Property. Finally, Wells failed to disclose the $600,000 refinance of the Hanover Property that occurred in June 2004. And though eventually appearing on

---

support payments paid into his brother's account at Fort Worth National Bank. Pl. Exh. 8 at SOFA #14. While these payments should be listed in greater detail and, perhaps, listed in the response to other SOFA questions, the Court does not find that the payments were omitted. Likewise, the "antique armoire" was actually scheduled on Wells' second set of amended schedules as a "broken wardrobe" listed as his wife's separate property. Pl. Exh. 6 at Sched. B. Based on the testimony received at Trial, the omitted Bank of America account(s) belonged to Deborah Wells and were opened by her during her tenure there.

The Court declines to address the remaining alleged omissions either because there was insufficient evidence presented to support the claimed omissions, or because to do so would be unnecessarily redundant. The omissions that the Court addresses in the text are sufficient to support the Court's finding that Wells made a false oath in the completion of his Schedules and SOFAs.

[39]The loan application for the refinance of the Hanover Property was signed on March 29, 2004. Pl. Exh. 68. However, the note and deed of trust securing the refinance were not executed until June 14, 2004. Pl. Exh. 9-10.

Wells' amended Schedules and SOFAs, the Court is also troubled by Wells' initial failure to (i) either schedule his ownership of the Palo Pinto County mineral interest on Schedule A, or show the sale of that mineral interest to the 1999 Crow Family Limited Partnership in his SOFAs, (ii) schedule his Royal Oaks Country Club membership on Schedule B, and (iii) disclose his monthly contributions to his children's UGMA accounts in his SOFAs.[40]

Viewed in isolation, an argument can be made that certain of these omissions or misstatements are innocuous. In fact, Wells' counsel made a point to try and explain each of the omissions or misstatements at Trial, with the conclusion almost always being that the omissions were someone else's fault (usually his prior counsel, McNeff) or a misunderstanding on Wells' part as to what was required to be included in his Schedules and SOFAs. In a post-Trial submission, Wells' counsel relied upon the recent unpublished decision in *Davis v. Tomasek (In re Tomasek)*, 2006 WL 925536 (5th Cir. Apr. 7, 2006) to support his argument that Wells' discharge should not be denied based on the number of errors and omissions in his Schedules and SOFAs.

But, Wells' reliance on *Tomasek* is misplaced, because the court there upheld the bankruptcy court's determination that the debtor provided sufficient explanations as to the omissions and errors on his schedules such that none of the omissions and errors were made with fraudulent intent. 2006 WL 925536 at *6. The bankruptcy court had further found that the omissions and errors related to items of trivial value or were correctly listed elsewhere in the debtor's schedules and SOFAs.[41] *Id*.

---

[40]The Court declines to address the remaining items initially omitted from Wells' Schedules and SOFAs because to do so would be unnecessarily redundant.

[41]The false statements in *Tomasek* included: (1) the debtor's failure to list the name and address of his bank; (2) the debtor's failure to list his DVDs, CDs, and books; (3) the debtor's failure to list his two cameras and their value; (4) the debtor's failure to list an interest in his mother's trust; (5) the debtor's failure to list a personal guaranty of a debt; (6) the debtor's failure to list the names and addresses of landlords and the debtor's liability on a lease; (7) the debtor's failure to list certain co-debtors; and (8) after the debtor's amendment to his schedules to include an interest in his mother's trust, his continued failure to include the other above-listed items. *Tomasek*,

Those are not our facts.

Here, the Court cannot conclude that Wells has sufficiently explained the absence of these items from his Schedules and SOFAs such that the omissions or errors were made without fraudulent intent; nor can the Court conclude that these omissions relate to items of trivial value, or are included elsewhere in Wells' Schedules and SOFAs. Wells simply failed to disclose the $39,000 real estate commission he received upon the purchase of the Grassmere Property. Accordingly, Wells' year-to-date 2005 income was understated by over forty percent over four different versions of his SOFAs, each signed under penalty of perjury.

As noted previously, there is no way the pool at the Grassmere Property was completed, nor the project paid for, prior to the Petition Date. Accordingly, the contract that Wells entered into with Master Craft Pools for the construction of the pool was still an executory contract on the Petition Date, and Wells was required to disclose it on Schedule G—but did not. Over four different sets of Schedules, the pool contract never appears. Moreover, Wells knew the contract was incomplete as of the Petition Date, and he took steps to try and hide the payments he made for the pool from his creditors and the Trustee by purchasing cashier's checks to pay for the pool. Finally, the dates of payment to Master Craft Pools as shown on Wells' SOFAs are incorrect.

Likewise, Wells purchased the Grassmere Cashier's Check and put it in his son's name, as earnest money for the purchase of the Grassmere Property, with full knowledge that the $25,000 was his personal property. Wells never disclosed this transfer on any set of SOFAs.

Finally, Wells never disclosed the $600,000 refinance of the Hanover Property that occurred in June 2004 on any set of SOFAs. When questioned as to why he failed to disclose the refinance in

---

2006 WL 925536 at *6 n.5.

**Memorandum Opinion and Order**                                    **Page 28**

response to question ten of his SOFAs,[42] Wells stated: "I didn't think it was a transfer to refinance my home." Unfortunately, Wells was wrong. When he refinanced the Hanover Property, Wells signed a new note and a new deed of trust. The signing of the deed of trust transferred Wells' interest in the Hanover Property as security for repayment of the new note, thereby falling squarely within the disclosure requirements of SOFA question ten.

All of these omissions are material because they bear a relationship to Wells' business transactions or estate. Moreover, they evidence the existence and disposition of Wells' property.

The other highlighted omissions, including the failure to list the Palo Pinto County mineral interest, the failure to list the Royal Oaks Country Club membership, and the failure to list Wells' contributions to his children's UGMA accounts, were later rectified through amendment of Wells' Schedules and SOFAs. Pl. Exh. 6-8; MC dkt. # 30-31, 57-59. However, these omissions were material because of the relationship they bore to Wells' business transactions or estate and their nature as being, or involving the disposition of, Wells' property. Especially troubling is Wells' initial omission of the Palo Pinto County mineral interest as being either an interest in real property he owned on the Petition Date (and therefore listed on Schedule A) or a transfer of property occurring within one year of the Petition Date under SOFA question ten. While Wells' testimony evidences

---

[42]Question ten reads as follows: "List all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately proceeding the commencement of this case." The execution of a deed of trust to World Savings Bank for the refinance of the Hanover Property constitutes a transfer of Wells' property. 11 U.S.C. § 101(54); *Boyd v. Superior Bank FSB (In re Lewis)*, 270 B.R. 215, 217 (Bankr. W.D. Mich. 2001) (stating that giving of mortgage constitutes transfer of debtor's interest in property). The term "transfer" is "'used in its most comprehensive sense, and is intended to include every means and manner by which property can pass from the ownership and possession of another. Indeed, the Code's expansive definition literally encompasses every mode of parting with an interest in property.'" *Weaver v. Kellogg*, 216 B.R. 563, 573 (Bankr. S.D. Tex. 1997) (quoting *Besing v. Hawthorne (In re Besing)*, 981 F.2d 1488, 1492 (5th Cir. 1993) (internal quotations omitted)).

**Memorandum Opinion and Order** **Page 29**

some confusion as to whether he owned the mineral interest on the Petition Date or had just sold it,[43] his confusion is surprising given the fact that he is a lawyer with some real estate experience. In any event, the mineral interest had to be one or the other on the Petition Date, but it was not disclosed in either place.[44] This omission was "cured" in the first amendments to Wells' SOFAs and was disclosed as a transfer within one year of the bankruptcy filing. Pl. Exh. 5 at SOFA # 10.

Wells testified that he failed to disclose the Royal Oaks Country Club membership in his initial Schedules because he did not think it had any value. But as noted in *Guenther*, it is not for a debtor to decide whether or not he should list an asset; rather, the debtor must disclose the asset and let the creditor decide whether the asset will benefit or prejudice him. 333 B.R. at 768. Clearly, Wells knew of his country club membership when he filed the Case, and he failed to disclose that asset.

The Court cannot help but notice a troubling pattern behind Wells' amendments. Most of the amendments to Wells' Schedules and SOFAs came after some prompting of Wells by the Hughes, be it after contact by the Hughes' counsel asking that certain omitted items be added to the Schedules and SOFAs, or after the omissions became apparent during Wells' 2004 examination. In response to counsel questioning whether Wells had been cooperative in supplying the Trustee with information regarding assets Wells claimed to own, the Trustee testified as follows:

Trustee:     He has not been uncooperative, but there's been after exams and after documents produced, then there's disclosure—that's been a concern in the case.

---

[43]The Court notes that, under Texas law, a conveyance of real property "is effective and title is transferred when the following has occurred: (1) execution of the deed, and (2) delivery of the deed." *Adams v. First Nat'l Bank of Bells/Savoy*, 154 S.W.3d 859, 869 (Tex. App. 2005). "A deed does not have to be recorded to convey title." *Id*.

[44]Wells delivered, and was paid for, the deed to the mineral interest on the morning of his bankruptcy filing. In fact, Wells met the purchaser at the purchaser's bank and converted the check given to purchase the mineral interests into a cashier's check which he mailed to the IRS that day. The deed was not recorded until a few days later.

Counsel:     That what has been—

Trustee:     Then there's disclosure after we have an exam . . . .

This begrudging willingness to disclose the information required by the Schedules and SOFAs is inconsistent with Wells' obligations to his creditors and the Trustee, and it contravenes the purpose behind the bankruptcy system itself. The system depends on the honesty and candor of its debtors. An amendment to schedules and SOFAs to disclose assets or transfers once a debtor, like Wells, has been "caught" does not suggest the level of honesty and candor the bankruptcy system demands. Rather, Wells has a duty, secured by his personal oath, to complete his Schedules and SOFAs completely and accurately—ideally on the *first* try. Time and again, Wells testified at Trial that he understood the seriousness of the oath attached to completion of his Schedules and SOFAs.

While the Court does not expect perfection, when Wells' mistakes, initial omissions, and continuing omissions are viewed in the aggregate, they evidence a reckless indifference on Wells' part in completing his Schedules and SOFAs, from which a fraudulent intent will be inferred. There can be no doubt that these misstatements and omissions are material. Further, Wells made the false statements or omissions under oath while Wells knew them to be false. Accordingly, Wells' discharge must be denied in accordance with § 727(a)(4)(A).

### E.      Withholding of Information from Officer of the Estate:  § 727(a)(4)(D)

The Hughes also seek denial of Wells' discharge on the grounds that he withheld information from an officer of the estate—namely, the Trustee. Under § 727(a)(4)(D), the Court may deny a debtor's discharge where "the debtor knowingly and fraudulently, in or in connection with the case . . . withheld from an officer of the estate entitled to possession under this title, any recorded

information, including books, documents, records, and papers, relating to the debtor's property or financial affairs." 11 U.S.C. § 727(a)(4)(D).

"When a debtor files [bankruptcy], he is required to literally open all his records for the trustee's inspection. The court need not grant a discharge to a debtor who withholds information relating to his property or financial affairs." *Dreyer*, 127 B.R. at 595 (denying a debtor's discharge under § 727(a)(4)(D) for failing to turn over books and records to the trustee). "A debtor is under an affirmative duty to assist the Trustee in assembling records. The Trustee is not required to play detective and does not have the resources to do so." *Id*.

Here, the Trustee testified that there are still documents regarding Wells' financial affairs which he has not received from Wells, including cancelled checks. The Trustee also testified that he had received a number of documents regarding Wells' financial affairs from the Hughes' counsel instead of from Wells. When asked directly by the Court whether the Trustee had received enough documentation to be able to determine Wells' financial condition, the Trustee indicated that he was unsure he had received enough documentation to know all that is going on with Wells financially:

> The Court:  The question was, have you been given enough to be able to determine his financial condition—Mr. Wells' financial condition?
>
> Trustee:  I'm sorry, your Honor, I'm just struggling with—there's been let me—see if I can answer your question and then you can tell me if I didn't answer it again. There's been a good deal of investigation into the transactions and transfers of this particular debtor. We've gotten some records. There's been a lot of information that Ms. Lindauer has provided by virtue of subpoenas on third parties, etcetera. So when the question is asked of me—I have a lot of documents, but I don't know that I know exactly all that's going on with this particular debtor with regard to his financial affairs.

Notwithstanding the Trustee's testimony, it is important to differentiate between the Trustee's

concerns as to his overall understanding of Wells' financial situation and whether Wells complied with

his duty to cooperate with, and turn over documents in his possession to, the Trustee.

On cross-examination, the Trustee testified that Wells had been cooperative with the Trustee's

requests and that, to the Trustee's knowledge, there were no outstanding document requests from

the Trustee to Wells:

> Counsel:    Can you tell the Court, are there any written requests for
> documents that you have requested of the Debtor that are still
> outstanding?
>
> Trustee:    I'm not aware of any.

While Wells' failure to preserve his personal financial records is sufficient to deny him a

discharge under § 727(a)(3) as explained above, the Court cannot conclude that Wells intentionally

withheld documents from the Trustee, especially in light of the failure of the Trustee or the Hughes

to specifically identify any documents that Wells possessed that he withheld. Wells testified that he

turned over all documents he could find.[45] Based on this testimony, and the insufficiency of any

contrary evidence presented by the Hughes, the Court concludes that Wells should not be denied a

discharge under § 727(a)(4)(D).

### F.    Loss of Assets: § 727(a)(5)

The Hughes next object to Wells receiving a discharge on the grounds that Wells failed to

explain satisfactorily the loss of assets of the estate or why there is a deficiency of assets to meet his

liabilities. Under § 727(a)(5), a debtor may be denied a discharge where "the debtor has failed to

explain satisfactorily, before determination of denial of discharge . . ., any loss of assets or deficiency

---

[45]While Wells made this statement in response to whether he turned over documents to the Hughes, the Court notes that, based on the testimony at Trial, the Hughes shared much, if not all, of the information they received with the Trustee.

**Memorandum Opinion and Order**                                                          **Page 33**

of assets to meet the debtor's liabilities." 11 U.S.C. § 727(a)(5). A creditor has the initial burden of making known by proper allegation in its complaint the assets the debtor once had but which are no longer available for creditors. *Mozeika v. Towsley (In re Townsley)*, 195 B.R. 54, 64 (Bankr. E.D. Tex. 1996); *see also First Tex. Savings Ass'n, Inc. v. Reed (In re Reed)*, 700 F.2d 986, 992 (5th Cir. 1983); *First Nat'l Bank of Amarillo v. Holmes (In re Holmes)*, 121 B.R. 505, 508 (Bankr. N.D. Tex. 1990) (Akard, J.). Upon the creditor's introduction of evidence substantiating the disappearance of substantial assets of the debtor, "the burden shifts to the [d]ebtor to explain satisfactorily the losses or deficiencies." *Townsley*, 195 B.R. at 64; *see also Reed*, 700 F.2d at 992-93. The explanation offered by the debtor of the disposition of assets need not be meritorious; rather, the explanation need only satisfactorily account for the disposition. *Holmes*, 121 B.R. at 508. Whether a debtor has satisfactorily explained a loss of assets is a factual finding to be made by the bankruptcy court. *Cadle Co. v. Andrews (In re Andrews)*, 98 Fed. Appx. 290, 295 (5th Cir. 2004).

Here, the Complaint alleges no specific loss or deficiency of assets. *See* AP dkt. # 1 at 25.[46] At Trial, the Hughes' counsel did point to two issues to substantiate the Hughes' request for a denial of Wells' discharge under § 727(a)(5): (1) Wells' amendment of his SOFAs to include higher levels of pre-petition income,[47] and (2) his act of negotiating client checks and converting them into cashier's checks for the purchase of the Grassmere Property, without first depositing the client checks

---

[46]Were the Court to rely on the Complaint alone, there is little doubt that the Hughes would have failed to meet their burden. *See Krohn v. Cromer (In re Cromer)*, 214 B.R. 86, 96 (Bankr. E.D.N.Y. 1997) (Duberstein, C.J.) (noting that mere reiteration of language of statute fails to meet burden of establishing prima facie case that specific assets of debtor omitted).

[47]Wells' initial set of SOFAs lists his gross income as follows: $226,209.00 for 2003; $315,952.00 for 2004; and $50,000.00 for 2005 (up until the Petition Date). Pl. Exh. 4 at SOFA # 1. Wells' third amended set of SOFAs increased his gross income to the following: $309,418.00 for 2003; $695,000.00 for 2004 (includes $240,000.00 which represented a client's portion of a contingency fee that was wired to the client upon Wells' receipt); and $50,000.00 for 2005. Pl. Exh. 8 at SOFA # 1.

into a law firm operating account. After considering these separate allegations, the Court declines to deny Wells' discharge under § 727(a)(5).

First, the Court fails to see how the increase in Wells' reported income through the amendment of his SOFAs evidences the loss of any assets. The Hughes did not do much more than ask aloud what happened to this income.[48] While it is true that Wells made a lot of money in the years leading up to the filing of the Case, his Schedules and SOFAs, along with his testimony at Trial, indicate that Wells and his family lived a lifestyle commensurate with his income. In fact, Wells' Schedule I reflects that, at the time of his filing of the Case, Wells had monthly income of $32,530 and monthly expenses of $32,874.70. Pl. Exh. 4 at Scheds. I & J. Converting these numbers to yearly figures, Wells would be making $390,360 per year,[49] but spending $394,496.40 per year. Even with the changes in income on Wells' amended SOFAs, the income figures are relatively consistent with his income figures for 2003 and 2004.[50] While there is somewhat of a range of income figures,

---

[48]The Hughes' counsel summarized the rationale for seeking a denial of discharge under § 727(a)(5) in her closing arguments to the Court:

Counsel:     . . . There just wasn't any plausible explanations given by the Debtor for the loss of assets. And what I most clearly look at are things like changing your statement of financial affairs and changing your income—substantially changing your income. Now they gave an explanation for one year but—

Court:       Well, the income was higher.

Counsel:     Right, right. So where there should've been more money somewhere if the income was higher rather than lower, so it raises questions—because where do those dollars go? There's a lot of dollars there that have, have evaporated.

[49]It should be noted that if the missing $39,000 commission earned on the purchase of the Grassmere Property is added to Wells' 2005 gross income figure, his total gross income through April 20, 2005, would have been $89,000.00.

[50]Wells' income, based on his reported gross income and his projected income from the figures on Schedule I, ranged from $309,418.00 to $695,000.00. However, as noted in footnote 42, *supra*, the $695,000.00 income figure is skewed; a more appropriate figure for Wells' 2004 gross income would be $455,000.00, once the client portion of a contingency fee Wells received is subtracted. While the $455,000.00 figure is somewhat higher than Wells' projected income for 2005, the Hughes made no evidentiary showing that these assets were lost or that

**Memorandum Opinion and Order**                                                                          **Page 35**

that, in and of itself, is not enough to make a prima facie showing that there was a loss of assets of Wells' estate.[51] Further, it is clear why there is a deficiency of assets to meet Wells' liabilities–*i.e.*, as evidenced by Schedules I and J, Wells spends more than he makes, a not uncommon formula for requiring bankruptcy assistance.

While Wells' failure to deposit client checks into a law firm operating account before spending that money is troubling, the result is the same. Wells explained at Trial his use of the client funds to purchase the Grassmere Cashier's Check. This explanation is satisfactory to account for the alleged loss of this particular asset. Beyond this transaction involving conversion of client funds directly into a cashier's check, the Hughes did not point to any other specific instance of Wells' taking funds from his law practice and converting them, off the books, into funds for his own personal use.[52]

Because of the Hughes' failure to present sufficient evidence to make a prima facie case of a loss of assets in regards to the change in Wells' scheduled income, and because of Wells' satisfactory explanation accounting for the use of client funds in the purchase of the Grassmere Property, the Court concludes that there are inadequate grounds for denying Wells' discharge under § 727(a)(5).

## G. Refusal to Obey A Lawful Order of the Court: § 727(a)(6)(A)

Finally, the Hughes object to Wells being granted a discharge on the grounds that Wells failed

---

Wells didn't simply spend this income in day-to-day consumption. Part of the reason for the decline in income for 2005 appears related to Wells' involvement in the Case; Wells testified that he had been unable to focus as much of his time on generating income because of his focus on and dealings with the Case. Likewise, Wells' expenditures appear to have been higher in past years. For instance, Deborah Wells testified that she recently had some serious medical issues. Wells testified that the family had incurred substantial medical bills for Deborah's treatment.

[51]If anything, the range in income figures signifies the cyclical work of a solo practitioner like Wells.

[52]The Hughes' counsel did allude to the possibility that an additional $16,000 of client funds generated in Wells' law practice had been directly converted to funds for his personal use as payment to Capital Title for the purchase of the Grassmere Property. However, the Hughes presented no evidence to substantiate this allegation.

**Memorandum Opinion and Order**                                                                **Page 36**

to comply with either (i) this Court's Order Granting Motion for 2004 Examination of the Debtor (the "2004 Order") and ordering Wells to produce documents responsive to the Hughes' request or (ii) the obligation of Wells to disclose his fee arrangement with his attorneys.[53] Under § 727(a)(6)(A), a debtor may be denied a discharge where the debtor "has refused . . . to obey any lawful order of the court, other than an order to respond to a material question or to testify." 11 U.S.C. § 727(a)(6)(A). Therefore, in order to deny the debtor a discharge under § 727(a)(6)(A), the objecting party must show "by a preponderance of the evidence that: 1) the Court issued an order directed at the debtor; 2) the order was lawful; 3) the order was not one requiring a response to a material question or to testify; and 4) the debtor refused to obey the order." *Gillman v. Green (In re Green)*, 335 B.R. 181, 183 (Bankr. D. Utah 2005).

"The party objecting to discharge satisfies [its burden of showing non-compliance with an order] by demonstrating the debtor received the order in question and failed to comply with its terms." *Missouri ex rel. Nixon v. Foster (In re Foster)*, 335 B.R. 709, 716 (Bankr. W.D. Mo. 2006). Showing that a debtor merely failed to comply with the terms of an order is not enough; § 727(a)(6)(A) uses the word "refused"—accordingly, the debtor's lack of compliance with the order must be "willful and intentional." *Id*.; *Green*, 335 B.R. at 184; *see also Taunt v. Patrick (In re Patrick)*, 290 B.R. 306, 313 (Bankr. E.D. Mich. 2003); *but see Hunter v. Magack (In re Magack)*, 247 B.R. 406, 409-10 (Bankr. N.D. Ohio 1999) (stating that application of a civil contempt standard to action brought under § 727(a)(6)(A) is proper, rather than making finding of intent or willfulness).[54]

---

[53]At Trial, the Hughes also raised allegations that Deborah Wells had withdrawn funds from her retirement account in violation of this Court's Order Approving Stipulation. Pl. Exh. 111. The Court declines to address this issue in the context of these proceedings because to do so could penalize the Debtor for the alleged actions of his wife.

[54]The lack of agreement among courts as to whether the term "refused" requires an element of willfulness or intent was identified in *Katz v. Araujo (In re Araujo)*, 292 B.R. 19, 23 (Bankr. D. Conn. 2003). In light of the

Once the objector meets his burden, the debtor then has an obligation to explain his non-compliance with the court's order. *Foster*, 335 B.R. at 716. An objection to discharge under § 727(a)(6)(A) may be denied "'when the debtor's failure to comply with an order was due to inadvertence and mistake, as opposed to wilful, intentional disobedience or dereliction.'" *Solomon v. Barman (In re Barman)*, 237 B.R. 342, 349 (Bankr. E.D. Mich. 1999) (quoting *United States v. Dowell (In re Dowell)*, 61 B.R. 75, 78 (Bankr. W.D. Mo. 1986)); *Transamerica Commercial Acceptance Corp. v. Jarrell (In re Jarrell)*, 129 B.R. 29, 33 (Bankr. D. Del. 1991) ("Bankruptcy law recognizes that mere failure does not equal refusal where the creditor does not show wilful or intentional disobedience, as opposed to inability, inadvertence or mistake."). The debtor cannot claim inadvertence or mistake, however, if the evidence presented establishes that the debtor was aware of the orders sent to him and simply disregarded them. *Barman*, 237 B.R. at 349.

In the 2004 Order, the Court ordered Wells to submit to the Hughes all documents in Wells' "possession, custody and control" responsive to the Hughes' document request. Pl. Exh. 110 at 2;

---

division among the courts, the Court will follow the line of cases supporting the need to find intentional or wilful non-compliance in order to find that a debtor has refused to comply with an order of the Court, because this is the stance taken by the majority of courts addressing the issue. Further, the Court believes this is the position the Fifth Circuit would take based upon the pre-Bankruptcy Code decision of *In re Jones*, cited in the text. In *Jones*, the Fifth Circuit cited with approval the Second Circuit's decision in *In re Kokoszka*, 479 F.2d 990 (2d Cir. 1973), *aff'd sub nom. Kokoszka v. Belford*, 417 U.S. 642, 94 S. Ct. 2431, 41 L. Ed. 2d 374 (1974). *Jones*, 490 F.2d at 455-56. The court noted that, prior to denying a debtor's discharge for failure to comply with a court order, the factfinder should

"weigh the detriment to the proceedings and the dignity of the court against the potential harm to the debtor if the discharge is denied. He should consider such factors as the *intent* behind the bankrupt's acts—were they *wilful* or was there a justifiable excuse; was there injury to the creditors, and is there some way the bankrupt could make amends for his conduct."

*Id*. at 456 (quoting *Kokoszka*, 479 F.2d at 997-98) (emphasis added). "'[T]here are many circumstances where a bankrupt's disobedience may have been inadvertent or otherwise excusable. . . . [T]he denial of a discharge is not the only weapon available to the [court] in order to enforce [its] orders as a recalcitrant [debtor] can also be held in contempt." *Id*. at 456 (quoting *Kokoszka*, 479 F.2d at 997). In *Jones*, the court affirmed the bankruptcy court's decision not to deny a debtor a discharge for failure to comply with an order of the court based in part on the bankruptcy court's finding that the debtor's failure was "not due to wilful, intentional disobedience or dereliction, but rather to inadvertence and mistake." *Id*.

MC dkt. # 32 at 2. Among the documents requested were Wells' credit card statements for the two years prior to the Petition Date, bank statements for the five years prior to the Petition Date, including cancelled checks, and copies of any financial statements prepared for any lender or creditor in the five years prior to the Petition Date. MC dkt. # 7. The 2004 Order constituted a lawful order of the Court. *Foster*, 335 B.R. at 716 (noting that, for purposes of § 727(a)(6)(A) analysis, a lawful order of the court "clearly includes orders requiring the debtor to produce documents relating to his or her financial condition").

In construing the phrase "possession, custody or control" in an analogous context–*i.e.*, a request for documents under Federal Rule of Civil Procedure 34, "federal courts have universally held that documents are deemed to be within the possession, custody or control of a party for purposes of Rule 34 if the party has actual possession, custody or control of the materials *or* has the legal right to obtain the documents on demand." *Resolution Trust Corp. v. Deloitte & Touche*, 145 F.R.D. 108, 110 (D. Colo. 1992) (citing cases from various circuits). Similarly, in construing identical language in the context of a request for documents made pursuant to Federal Rule of Civil Procedure 45, it has been noted that the rule, which requires a person to turn over responsive documents in his "possession, custody, or control," is "broadly construed to encompass both actual and constructive possession." *Thomas v. Deloitte Consulting LP*, 2004 WL 1372954, at *4 (N.D. Tex. June 14, 2004).

In *Thomas*, certain parties were asked to turn over bank statements and checks pursuant to a subpoena request under Rule 45. *Id*. The parties did so, but they did not make complete disclosure of all documents, arguing instead that they had produced all bank statements and checks in their or their accountant's *actual* possession. *Id*. The court rejected this argument, instead finding that

because the parties required to turn over the documents had not made an argument that they did not have a legal right to obtain the missing bank statements and checks from their financial institutions, they would be required to seek copies of the records or provide authorizations for the requesting parties to do so. *Id.*; *see also Zervos v. S.S. Sam Houston*, 79 F.R.D. 593, 595-96 (S.D.N.Y. 1978) (requiring party to make request for his bank records because he failed to show that he lacked control over the records by proving that his access to the records was denied); *Cadle Co. v. Terrell*, 2002 WL 22075, at *5 (N.D. Tex. Jan. 7, 2002) *aff'd sub nom. Cadle Co. v. Terrell (In re Terrell)*, 46 Fed. Appx. 731 (5th Cir. 2002) (noting that debtors had obligation to turn over bank and credit card statements to creditor because debtors had legal right to request copies of credit card statements from credit card company and bank statements from bank).

At Trial, Wells testified that he had produced all documents responsive to the Hughes' request *of which he had copies*. But, Wells did not attempt to obtain copies of other documents he was ordered to produce at his 2004 exam from third parties who still had copies of such documents. And, Wells failed to prove at Trial that the unproduced documents were beyond his control. By failing to produce all of the documents that were within his possession, custody, or control, Wells failed to comply with the 2004 Order.

This, however, is not the end of the inquiry; for while the Court finds that Wells failed to comply with the 2004 Order, his non-compliance was neither wilful nor intentional. Time and again at Trial, Wells testified that he offered to provide whatever releases were necessary to allow the Hughes to obtain any documents they sought of which he no longer had copies.[55] While Wells was

---

[55]In fact, Wells testified that he offered to sign a release for the Hughes on nine separate occasions during his 2004 exam. The Hughes, without explanation, never took Wells up on his offer. Based on the history of hard feelings between the parties, part of the reason behind the Hughes' failure to ask for a release could be because the Hughes never really wanted the missing documents as much as they wanted an excuse for seeking a denial of

mistaken as to the extent of his obligation to provide documents under the 2004 Order, the Court declines to impose the death penalty in bankruptcy–*i.e.*, a denial of Wells' discharge under § 727(a)(6)(A), for this mistake. "[I]t is totally within the discretion of the bankruptcy court to find a particular violation of the court's order so serious as to require denial of discharge." *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 755 (9th Cir. 1985).

In coming to this conclusion, the Court looks to the *Thomas* opinion for guidance. 2004 WL 1372954 at *4. In *Thomas*, the court ordered the parties failing to produce documents to do what Wells offered to do of his own volition—*i.e.*, to provide authorizations enabling the parties seeking documents to obtain the documents for themselves. While the Hughes could have: (i) taken Wells up on his offer of releases, (ii) sought a motion to compel Wells' compliance with the 2004 Order, or (iii) filed a motion to find Wells in contempt for his failure to comply with the 2004 Order, they did none of those things.

Because the penalty for failing to comply with an order requiring a party to turn over documents in his control, at least in the context of a motion to compel, appears to warrant punishment on a level less severe than a denial of discharge, the Court concludes that a denial of Wells' discharge would be too harsh an outcome for Wells' failure to comply with the 2004 Order. The Court therefore declines to deny Wells' discharge under § 727(a)(6)(A) for this failure.

Similarly, the Court declines to find that Wells violated an order of the Court because of Wells' counsel's failure to disclose his fee arrangement with Wells. Under Local Bankruptcy Rule 2016.1, "the statement required by 329 of the Bankruptcy Code and Bankruptcy Rule 2016(b) shall be filed by the attorney for the debtor within 10 days after filing of the case . . . ." Section 329 of

---

Wells' discharge.

**Memorandum Opinion and Order** **Page 41**

the Bankruptcy Code likewise requires counsel to disclose his fee arrangement with his client. 11 U.S.C. § 329(a). Clearly, the burden was on Wells' *counsel*, not Wells, to disclose to the Court the fee arrangement that counsel has with Wells. Accordingly, Wells' discharge will not be denied on § 727(a)(6)(A) grounds for his alleged failure to disclose the attorney/client fee arrangement.

## III.    Conclusion

For the reasons stated, Wells' discharge is denied in accordance with 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(3), and 727(a)(4)(A). The Court declines to deny Wells' discharge under 11 U.S.C. §§ 727(a)(4)(D), 727(a)(5), and 727(a)(6)(A).

**SO ORDERED**.

**### End of Order ###**